**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **HUAWEI TECHNOLOGIES CO., LTD.,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | **CIVIL ACTION NO. 11-cv-497** |
| ) | |
| **v.** ) | |
| ) | |
| **MOTOROLA, INC., MOTOROLA** ) | **Hon. Sharon Johnson Coleman** |
| **SOLUTIONS, INC., MOTOROLA** ) | |
| **MOBILITY HOLDINGS, INC.,** ) | |
| **NOKIA SIEMENS NETWORKS US,** ) | |
| **LLC AND NOKIA SIEMENS NETWORKS** ) | |
| **B.V.** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on motion by Huawei Technologies Co., Ltd. ("Huawei")

for a preliminary injunction against Defendants Motorola Solutions, Inc.[1] ("Motorola"), Nokia

Siemens Networks US, LLC and Nokia Siemens Networks B.V. to maintain the *status quo*

pending arbitration and prevent Motorola from disclosing Huawei confidential information and

trade secrets to the Nokia Defendants (collectively "NSN") and to prevent NSN from using the

same. (Dkt. No. 9.) The parties filed extensive briefs on the matter and the Court conducted an

evidentiary hearing beginning on February 11, 2011 and continuing on February 14, 2011. For

the reasons that follow, the Court grants Huawei's request for a preliminary injunction in part

and denies the request in part.

---

[1] As of January 4, 2011, Motorola, Inc. was spun off into two publicly traded companies: (1) Motorola Solutions, Inc. and Motorola Mobility Holdings, Inc. Motorola, Inc. no longer exists. Huawei voluntarily dismissed Motorola Mobility Holdings, Inc. without prejudice on February 10, 2011. (Dkt. No. 96.)

## BACKGROUND

### I.  The Parties

Huawei is a Chinese corporation and leading provider of next generation telecommunications network solutions for operators around the world.  Motorola is a Delaware corporation and global provider of wireless and broadband communications.  NSN is a joint venture formed from business units of Nokia Corporation of Finland and Siemens AG of Germany.  Nokia Siemens Networks US LLC is a Delaware corporation and Nokia Siemens Networks B.V. is a Dutch corporation.  NSN sells mobile infrastructure hardware and service agreements to carrier companies and is a direct competitor to Huawei.

### II.  The Huawei and Motorola Agreements

Beginning in June 2000, Huawei and Motorola entered into a series of agreements under which Huawei would develop, design, and implement new optimized technologies for cellular communications networks and then sell those technologies and other Huawei products to Motorola.  Motorola would then resell the technologies and products under the Motorola brand. The technologies Huawei developed and provided to Motorola under the various agreements include:  Global Systems for Mobile ("GSM") communications products, Radio Network Controller ("RNC") products, and Universal Mobile Telecommunications Systems ("UMTS") products.  Motorola purchased approximately $878 million in equipment from Huawei from 2000 through the present.

To ensure that Motorola could service its customers and repair and maintain the Huawei equipment, the agreements between the companies contemplated that Huawei provide Motorola with highly confidential information.  The agreements required Motorola to protect Huawei's confidential information and prohibited Motorola from disclosing Huawei's confidential

information to third parties.  The two agreements that are most relevant to the instant matter are

the Restated Cooperation Agreement ("RCA") and the Joint Research and Development Center

Agreement ("JRDC").  Both agreements remain in force today and impose ongoing protections

on Motorola's use of Huawei's confidential information.  Under the RCA, Motorola and Huawei

agreed that the party receiving confidential information acknowledges that this information may

contain trade secrets and proprietary information and that the unauthorized disclosure of this

information may cause irreparable harm to the disclosing party.  Dispute resolution provisions in

the RCA and JRDC provide that all disputes arising under the agreements must be resolved

through arbitration before a Tribunal of the International Chamber of Commerce in Geneva,

Switzerland.

### III.  The Motorola/NSN Transaction

In the fall of 2009, investment bankers working on Motorola's behalf contacted Huawei

and other parties to explore whether they would be interested in purchasing Motorola's wireless

networks infrastructure business and its assets.  Through this business, Motorola provides

equipment and services to wireless network carriers such as Verizon and AT&T.  Huawei

submitted an initial non-binding bid in December 2009 and a revised bid in April 2010.

Motorola ultimately decided to sell its wireless networks business to NSN and the

Motorola/NSN transaction was announced on July 19, 2010.  With the exception of the Ministry

of Commerce of the People's Republic of China ("MOFCOM"), the Motorola/NSN transaction

had been approved by the necessary government antitrust agencies.  The transaction is expected

to close following MOFCOM's approval.  Under the contemplated transaction, NSN will acquire

Motorola's GSM and UMTS networks, including all of the equipment and connections that

comprise these networks as well as Motorola's business in servicing and maintaining these networks. NSN will also acquire all of the network equipment that Huawei has provided Motorola pursuant to the RCA, JRDC, and other agreements between Huawei and Motorola.

### IV. Motorola Seeks Huawei's Consent To Assign The Agreements To NSN

By letter dated September 13, 2010 Michael Annes, Corporate Vice President of Business Development and Ventures for Motorola, informed Huawei of the Motorola/NSN transaction and requested Huawei consent to Motorola's assignment to NSN of 13 Motorola-Huawei agreements. (Annes Decl. Ex. E.) Huawei declined to consent to the assignment and demanded Motorola identify effective measures to protect the confidential information Huawei shared with Motorola pursuant to the agreements. (*Id.* at Ex. F.) On October 13, 2010, Motorola and NSN jointly responded with measures both organizations agreed to undertake to "prohibit the dissemination of Huawei Confidential Information ("Huawei CI") while still properly supporting Motorola's infrastructure customers using Huawei-manufactured Products." (*Id.* at Ex. G.) The identified measures placed Motorola personnel into separate categories depending upon whether they had access to Huawei confidential information relating to currently available or future Huawei products and described the access to Huawei confidential information that would be permitted once the transaction closed and the personnel became NSN employees. Post-closing, former Motorola employees with access to future Huawei product features, offerings, and specifications would be required to review their files and destroy any materials related to these future products. The former Motorola employees with access to commercially available Huawei products would be "firewalled" within NSN so that they would be the only NSN employees with access to Huawei confidential information.

On October 26, 2010, Huawei sent a response to Motorola and NSN reiterating that Huawei would not consent to the assignment of the agreements and explaining that the proposed measures were not sufficient to protect the confidentiality of Huawei's confidential information. (*Id.* at Ex. H.)  Motorola and Huawei's discussions on protection of the Huawei confidential information continued into November and December 2010.  (Annes Decl. Exs. I & J.)  On January 8, 2011, Huawei sent separate letters to Motorola and NSN restating its position and specifying the steps Huawei believed necessary to protect its confidential information and to avoid trade secret misappropriation and breach of the Motorola-Huawei agreements.  (*Id.* at K; Dianyao Decl. Ex. 10.)  The steps included Motorola's agreement that it would not facilitate NSN's hiring of Motorola employees who have had access to Huawei confidential information, not grant any NSN personnel access to any Huawei confidential information, and require all Motorola employees who have had access to Huawei confidential information to sign non-disclosure agreements with Huawei.  (*Id.*)  Motorola responded by letter dated January 10, 2011 indicating that neither it nor NSN had any intention of breaching any agreement with Huawei or misappropriating any of its trade secrets through the sale of Motorola's network infrastructure business to NSN.  (Annes Decl. at Ex. L.)  Motorola also stated that it was willing to discuss "all commercially reasonable steps to protect Huawei's trade secrets" in addition to the firewall solution Motorola previously recommended.  (*Id.*)  At Motorola's suggestion, the parties met in Hong Kong later that week on January 14, 2011 but were unable to reach agreement on the measures that would provide adequate protection for the Huawei confidential information. (Dianyao Decl. ¶ 38.)

The dispute resolution provision in the JRDC and the RCA provide that any disputes relating to the agreements follow a formal dispute resolution procedure.  (Dianyao Decl., Ex. 1 at

¶ 31.2.)  The procedures call for a 60 day waiting period after a meeting of top executives of Huawei and Motorola before a request for an arbitration can be filed.  (*Id*.)  Four days after the Hong Kong meeting, Huawei proposed to Motorola that the parties waive the 60 day waiting period and submit their dispute regarding the protection of Huawei's confidential information to arbitration.  (*Id.* at Ex. 12.)  Motorola did not agree to accelerate the arbitration process and the instant litigation followed.

## PROCEDURAL HISTORY

### A.  Commencement of Litigation and Motion for Temporary Restraining Order

On the morning of January 24, 2011, Huawei filed the instant action asserting claims of breach of contract, actual or threatened misappropriation of trade secrets, and copyright infringement against Motorola and claims of actual or threatened misappropriation of trade secrets and contributory copyright infringement against NSN.  (Dkt. No. 1)  That same morning, Huawei filed motions for a temporary restraining order and a preliminary injunction against Motorola and NSN.  (Dkt. Nos. 9, 14.)  That afternoon, the Court held a hearing on Huawei's motion for a temporary restraining order ("TRO").  Huawei requested an order requiring Motorola to provide Huawei and the Court with at least five business days' notice in advance of the closing of the Motorola/NSN transaction.  Huawei argued that Motorola and NSN intended to close the transaction immediately after receiving MOFCOM approval.   Huawei contended that if it were not granted injunctive relief, that Huawei's confidential information would be transferred to NSN before the arbitration tribunal had an opportunity to consider Huawei and Motorola's dispute thereby rendering the arbitration a meaningless exercise.  Huawei argued that it needed the notice so that it could take steps to seek further relief if necessary.  In asking the Court to deny the TRO, Motorola argued that it could not provide the Court with the five days'

notice Huawei was seeking because Motorola did not know when MOFCOM would approve the deal or when the transaction would close. The Court issued a TRO ordering Motorola not to provide any Huawei confidential information to NSN. (Dkt. No. 20.) Further, the Court ordered Motorola to provide the Court and Huawei with immediate written notice of any action taken by MOFCOM.[2]

**B. Motion for Preliminary Injunction**

The parties submitted extensive briefing on Huawei's motion for a preliminary injunction. Huawei initially sought a preliminary injunction to preserve the *status quo* by ordering Motorola to "modify its transaction with NSN to prevent the transfer of Motorola's GSM and UMTS business to NSN until such time as an arbitral tribunal has determined whether further interim relief is necessary." Huawei also sought injunctive relief against NSN to "prevent NSN from obtaining Huawei's trade secrets and copyrighted material in a manner for which Motorola may disclaim responsibility – for instance, by hiring Motorola employees in possession of Huawei's confidential information into service and support positions where they will necessarily need to make use of this information." (Dkt. No. 9-1 p. 3.) Huawei filed numerous declarations under seal in support of its motion which detailed the various categories of Huawei confidential information and trade secrets designated with "Internal Use" or "Highly Confidential" legends that it shared with Motorola and sought to protect, the investment Huawei made in developing this confidential information, the harm Huawei would suffer in the marketplace should this information be made available to a competitor, and the unfair competitive advantage NSN would gain should Motorola transfer this confidential information to NSN. (Xiren, Guangfeng, Wei, Hao, Yuqiao, Jianhui, Kai, Xiaocheng, and Yuan Decls.) The

---

[2] The Court later modified the TRO on 1/27/2011 and again on 2/4/2011 at the request of the parties. (Dkt. Nos. 42, 100.)

declarations establish that Huawei's technology and trade secrets are deeply embedded in Motorola's GSM and UMTS telecommunications networks. Huawei also provided declarations of Huawei employees and an industry expert attesting to the fact that NSN could not service, support, and maintain Motorola's wireless infrastructure business without using Huawei's confidential information. (Dianyao, Wei, and Crowe Decls.) Finally, Huawei produced a declaration explaining that Huawei's confidential information would be used at NSN if the Motorola employees who have been involved with Motorola-branded GSM and UMTS systems containing Huawei products are permitted to move to NSN and continue in their present roles. (Dianyao Decl. ¶ 32.) Huawei argues that this evidence demonstrates that Huawei has a high likelihood of succeeding on the merits on its claim that former Motorola employees who possess Huawei trade secrets would inevitably rely on Huawei trade secrets while employed by NSN in contravention of the law.

In its reply brief, Huawei proposed alternative injunctive relief including: (1) an order that would temporarily bar the transfer of Huawei's confidential information and Motorola's UMTS business unit and select portions of Motorola's GSM network supplied by Huawei; (2) an order barring the transfer to NSN of Huawei's confidential information and all customer contracts for customers that have Huawei equipment pending arbitration; and (3) an injunction that continues the relief that is currently in place by virtue of the TRO. (Dkt. No. 87 p. 26.)

## C. Evidentiary Hearing

### 1. Opening Arguments

The Court heard opening arguments on behalf of all of the parties followed by the testimony of witnesses called by Motorola and Huawei. Huawei argued that the record contained undisputed evidence that Huawei shared confidential information with Motorola and

that the need for an injunction to protect this information was clear given Motorola's letter of January 10, 2011 proposing that Motorola grant NSN employees access to Huawei confidential information. Huawei argued that the evidence showing that NSN could not provide customers with the same level of support as Motorola without access to Huawei's confidential information stood unchallenged. Huawei then conceded that the relief it originally sought to prohibit the transfer of the UMTS business or NSN's hiring of Motorola employing was not without consequences. Huawei proposed injunctive relief that instead included a monitoring and audit system to ensure that Motorola did not transfer any Huawei confidential information to NSN, an exit interview and new hire process to make personnel aware of the prohibition on taking or receiving Huawei confidential information, and the use of a third party vendor to ensure that any Huawei confidential information stored in electronic format was wiped clean such that the information could not be recovered or retrieved. (2/11/2011 Hr'g Tr. 19:16-24:17.)

Motorola argued that while Huawei now appeared to "sound reasonable" in its latest request for injunctive relief, that there was no injunctive relief that was good for Motorola or justified. (*Id.* at 27:19-23.) Motorola claimed that Huawei could not meet its burden to show it was entitled to a preliminary injunction and that any such order would allow NSN to make a claim that Motorola failed to use its best efforts to assign the contracts thereby providing NSN with a basis to walk away from the pending transaction. (*Id.* at 29:17-22.) Motorola contended that Huawei did not care about its confidential information, which it had already divulged, and that its true intent was to use its confidential information as a "poison pill" to kill the Motorola/NSN transaction. (*Id.* at 32:5-15, 43:7-12.) Motorola cited the lawsuit it filed against Huawei and others as a reason why Huawei wanted to sabotage the Motorola/NSN transaction.[3]

---

[3] The lawsuit Motorola referenced is *Motorola, Inc. v. Lemko, Corp.*, No. 08-cv-05427, pending before Judge Kennelly.

(*Id.* at 32:9-15.) Counsel argued that Motorola had already suffered harm due to the uncertainty surrounding the transaction that was originally scheduled to close on January 1, 2011 and that Motorola would suffer further harm if the transaction does not close by April 30, 2011. (*Id.* at 43:13-22, 45:7-16.)

NSN argued that Huawei was not entitled to a preliminary injunction because Huawei could not show that it had been harmed or that any harm was imminent. (*Id.* at 54:3-7.) NSN claimed that it had no Huawei confidential information and that all that Huawei was left with was a threat that NSN would obtain Huawei's confidential information. (*Id.* at 54:11-12.) NSN further claimed that it did not want to improperly obtain Huawei confidential information nor did NSN want Motorola to violate any of its agreements with Huawei. (*Id.* at 54:13-14, 55:7-11.) NSN stated, however, that it did want the Huawei information necessary for NSN to repair, service, connect, and maintain the Huawei equipment that NSN intends to acquire from Motorola. (*Id.* at 54:12-20.) Counsel for NSN alleged that any injunction that restricts NSN''s ability to repair, service, or maintain the Huawei products "kills the deal" between Motorola and NSN. (*Id.* at 59:21-60:3.)

## 2. Testimony of Michael Annes

Michael Annes ("Annes"), Corporate Vice President of Business Development and Ventures testified that he is responsible for leading all mergers, acquisitions, and divestures and that he led the negotiations related to the sale of Motorola's wireless infrastructure business. (*Id.* at 82:18-24.) Annes also led Motorola's discussions with Huawei to obtain its consent to assign the Motorola-Huawei agreements to NSN. (*Id.* at 84:22-24.) Annes testified that the firewall that Motorola proposed in its January 10, 2011 letter to Huawei would actually allow certain Motorola employees who transfer to NSN to continue to have access to Huawei confidential

information. (*Id.* at 97:25-98:23.) Annes explained that the reason Motorola proposed allowing NSN employees to use Huawei confidential information was to ensure NSN provided the proper support to Motorola customers using Huawei manufactured products. (*Id.* at 100:12-17.) Annes testified that Motorola's agreements with Huawei entitle Motorola to provide Huawei confidential information to certain third parties. (*Id.* at 96:3-11.)

Annes testified that there is no requirement in the Master Acquisition Agreement ("MAA") between Motorola and NSN that requires Motorola to transfer Huawei confidential information to NSN. (*Id.* at 90:19-22.) Under the MAA, if Motorola is unable to obtain consent to assignment, then Motorola will not make the assignment. (Id at 90:25-91:5.) Annes admitted that he did not know whether Motorola would decide to give Huawei confidential information to NSN if the Court does not issue an injunction. (*Id.* at 111:24-112:5.) Annes stated that such a decision would be made by Motorola's law division. (*Id.*)

Annes also testified that he believed any delay in the closing of the Motorola/NSN transaction pending the completion of arbitration would "kill the deal." (*Id.* at 93:15-94:4.) Annes admitted that Huawei proposed that the parties accelerate the arbitration process. (*Id.* at 94:15-95:6.) Annes explained that Motorola declined to do so because Motorola was afraid that the arbitration would distract them. (*Id.*)

### 3. Testimony of Scott Morrison

Scott Morrison ("Morrison"), Senior Director and General Manager of Motorola's GSM and UMTS research and development engineering teams testified about the COMPASS system Motorola uses to protect third party confidential information. (*Id.* at 126:20-127:8.) Morrison stated that it was his belief that many of the servers and applications that Motorola uses today

will remain at Motorola and be accessible by former Motorola employees who transfer to NSN. (*Id*. at 135:15-19.)

Morrison also testified about the increased attrition rate that the engineering team began to experience in December 2010 due to the uncertainty employees were experiencing because of the delay in closing the Motorola/NSN transaction. (*Id.* at 131:18-133:10.) Morrison admitted that he could not see how the increased attrition rate had anything to do with the lawsuit Huawei filed against Motorola and NSN. (*Id.*)

### 4. Testimony of Bruce Brda

Bruce Brda ("Brda"), Senior Vice President and General Manager of Motorola's wireless networks business testified that NSN made job offers to all 7,000 Motorola employees in the networks business. (*Id.* at 157:4-9.) Brda stated that NSN is also buying Motorola's buildings and other assets including computers and furniture. (*Id.* at 159:2-14, 162:3-7.)

Brda testified about the uncertainties that Motorola and any company faces when they announce the sale of a business. (*Id.* at 162:15-24) He stated that these uncertainties will continue until MOFCOM approves the deal. (*Id.*) Brda stated Huawei had nothing to do with the uncertainties that caused Motorola to lose business in China and Vietnam. (*Id.* at 162:8-17.)

Brda testified that the agreement with NSN could close without Motorola providing any Huawei confidential information to NSN. (*Id.* at 164:10-21.) Brda admitted that an injunction prohibiting the transfer of Huawei confidential information would not cause Motorola to breach its agreement with NSN. (*Id.* at 164:22-165:6.) Brda stated that he believed NSN would have no basis to back out of the deal if Motorola did not provide NSN with Huawei confidential information. (*Id.* at 165:8-13.)

**5.   Testimony of Tim Danks**

Tim Danks ("Danks") testified that he is responsible for customer support and for Huawei's technical support centers.  (*Id.* at 174:1-12.)  Danks testified about the difference between the type of service and support provided by a vendor of telecom equipment and the operation and maintenance that a customer performs on its telecom equipment.  (*Id.* at 174:23-175:10.)  Danks described the various resources that a vendor uses to support its equipment including signaling protocols between equipment, internal documentation, and other confidential information.  (*Id.* at 175:13-16.)  Danks testified that vendor support cannot be provided without the use of confidential information that is not provided to customers.  (*Id.* at 175:19.)  Danks testified that vendor level confidential information would be made available to an OEM like Motorola.  (*Id.* at 176:13-15.)

**6.   Testimony of David Crowe**

The Court heard testimony from David Crowe ("Crowe"), who Huawei presented as an expert witness in the area of telecommunication network systems.  (*Id.* at 192:1-16.)  Crowe testified that he reviewed Huawei's ABIS interface, which is the link between cellular transmission towers ("base stations") and the processor ("base station controllers") that allows them to work as a unit by allocating calls and resources between them.  (*Id.* at 192:5-9.)  Crowe opined that the ABIS interface used in Motorola's network was proprietary to Huawei.  (*Id.* at 192:5-9.)  Crowe testified that without knowledge of Huawei's proprietary ABIS interface, one could not properly service a Huawei 2G GSM network with UMTS capability containing hundreds of base station towers controlled by a base station controller.  (*Id.* at 194:23-195:7.)  Crowe testified that in the event that a Huawei base station controller failed, that someone with access to Huawei's proprietary ABIS interface could modify another manufacturer's base station

controller to operate in the network and save the expense of replacing hundreds of base station towers. (*Id.* at 194:23-196:8.) Crowe opined that vendor level customer support cannot be provided without access to the confidential information of the manufacturer. (*Id.* at 196:13-197:18.)

### G. Kristian Kuhn Declaration

The night before the evidentiary hearing, Motorola filed the declaration of Kristian Kuhn ("Kuhn"), Head of Managed Services for NSN. In the declaration, Kuhn stated that NSN had received Huawei confidential information pursuant to a managed services agreement between NSN and Nextel. Nextel purchased all of the equipment for its 3G telecommunications network from Huawei. Under the NSN-Nextel agreement, Nextel outsourced the maintenance of this equipment to NSN. At the hearing, Motorola claimed that the Nextel-NSN agreement proved that NSN already had Huawei confidential information and thus Huawei could not be irreparably harmed should Motorola provide NSN this same information.

Since the Kuhn declaration was filed after the close of briefing on the instant motion and neither Motorola nor NSN called Kuhn as a witness, the Court granted Huawei leave to file a response to this declaration. Huawei first noted that the Kuhn declaration was not supported with copies of any of the confidential documents Kuhn claimed were in NSN's possession. Huawei argued that the confidential information Kuhn referred to was information that Huawei provides to customers pursuant to a non-disclosure agreement to assist them in operating and maintaining the Huawei equipment they purchase. Huawei claimed customer level information is different from the confidential technical information related to the design and development of Huawei products that Huawei provided Motorola. As an example, Huawei described the training it provides Motorola to allow it to sell and service the Huawei equipment as a vendor as distinct

from the standard training Huawei provides its customers to assist them in operating and maintaining Huawei equipment. Huawei also noted that the Kuhn declaration did not state that NSN had received Huawei's proprietary ABIS interface or many of the other categories of confidential information that Huawei seeks to protect. Huawei supported its response with the declaration of Wu Haibin ("Haibin"), a Technical Product Manager at Huawei who is responsible for working with Nextel and NSN. Haibin attached several documents as exhibits to his declaration which disputed much of the Kuhn declaration. Haibin also included a copy of the customer training materials Huawei provided Nextel and NSN.

## FACTUAL FINDINGS

1. Huawei has provided Motorola with Huawei confidential information to enable Motorola to provide vendor level support, service, and maintenance to Motorola's customers with Huawei equipment.

2. NSN will need the Huawei confidential information to provide the newly acquired Motorola customers with the same level of vendor support, service, and maintenance that Motorola provided.

3. As recently as January 10, 2011, Motorola proposed providing its former employees who transfer to NSN with access to Huawei confidential information.

4. NSN does not currently have any vendor level Huawei confidential information.

5. NSN has customer level Huawei confidential information that Huawei provides to its customers under non-disclosure agreements.

6. Huawei and NSN are direct competitors in the wireless networks infrastructure business.

7.    NSN will gain an unfair competitive advantage if it obtains Huawei's vendor level confidential information without Huawei's consent.

8.  As part of the Motorola/NSN transaction, NSN intends to acquire Motorola's wireless assets including Motorola's buildings, computers, and equipment.

9.  NSN intends to employ former Motorola personnel to service, support, and maintain the Huawei equipment that NSN will acquire pursuant to the Motorola/NSN transaction.

10. Many of the Motorola employees involved with Huawei equipment will perform the same job responsibilities once they become NSN employees including providing support, service, and maintenance to customers with Huawei equipment with some employees even working in the same location.

11. The Motorola/NSN transaction has been delayed pending approval by MOFCOM.

12. Motorola has experienced a higher than average attrition rate in its wireless networks business which began prior to the commencement of this litigation.

13. If NSN obtains vendor level Huawei confidential information from Motorola before a Swiss arbitral panel has the opportunity to determine Motorola and Huawei's rights and obligations, the *status quo* will be altered leaving Huawei with inadequate relief.

## LEGAL STANDARDS AND CONCLUSIONS

A preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. *Winter v. Nat'l Res. Def. Council*, 129 S. Ct. 365, 376 (2008). To determine whether a situation warrants such a remedy, plaintiffs must show: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm without the injunction; (3) that the harm they would suffer is greater than the harm that the preliminary injunction would inflict on the defendants; and (4) that the injunction

is in the public interest. *Judge v. Quinn*, 612 F.3d 527, 546 (7th Cir. 2010). These

considerations are interdependent such that "the greater the likelihood of success on the merits,

the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Id*.

Taking into account all these considerations, the Court must exercise its discretion to arrive at a

decision based on a subjective evaluation of the import of the various factors and a personal,

intuitive sense about the nature of the case. *Girl Scouts of Manitou Council v. Girl Scouts of the

United States of America, Inc.*, 549 F.3d 1079, 1085 (7th Cir. 2008).

### A. Threatened Misappropriation of Trade Secret Claim

A party seeking a preliminary injunction in a threatened misappropriations of trade

secrets case must prove both the existence of a trade secret and a threatened misappropriation

*PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1268 (7th Cir. 1995) ("PepsiCo I"). A plaintiff may

prove a claim of threatened misappropriation of trade secrets by demonstrating that new

employment will inevitably lead employees to rely upon trade secrets gained during their

previous employment. *PepsiCo I*, 54 F.3d at 1269. To determine whether a threatened

misappropriation is actionable under the inevitable disclosure doctrine, the Court examines: (1)

the level of competition between the owner of the trade secrets and the new employer; (2)

whether the employees' position with the new employer is comparable to the position with the

former employer; and (3) the actions the new employer has taken to prevent the new employees

from using or disclosing the trade secrets. *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *20

(N.D. Ill. 1996) ("PepsiCo II"). Contractual prohibitions against disclosure of trade secrets are

routinely rejected as insufficient to prevent inevitable disclosure or use. *Id.* at *21 (collecting

cases).

Huawei has taken reasonable steps to maintain the secrecy of its confidential information including its ABIS interface specification, product and technical specifications, technology roadmaps, design and interface documentation, LTE statement of compliance and test case, original and design requirements, and configuration tools. These reasonable steps include marking any printed documents containing this information with the legend "Internal Use" or "Highly Confidential" and providing this information only under a non-disclosure agreement. Huawei derives economic value from this information not being generally known to its competitors who can benefit economically from the disclosure of this information. Huawei's confidential information constitutes a trade secret under the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (West 2011).

As recently as January 10, 2011, Motorola proposed allowing its former employees who transfer to NSN to have access to Huawei confidential information stored at Motorola. While Motorola concedes that the Huawei-Motorola agreements prohibit Motorola from disclosing Huawei confidential information without Huawei's consent, Motorola maintains that it has the right to disclose Huawei's confidential information to certain third parties. Motorola's proposal and it insistence that it can disclose Huawei trade secrets under certain circumstances, threaten to make Huawei confidential information available to Huawei's direct competitor NSN.

Similarly, NSN's intent to employ former Motorola personnel with access to Huawei confidential information to support, service, and maintain customers with Huawei equipment will inevitably cause these employees to use Huawei confidential information. While employees may use generalized skills and knowledge acquired during their previous employment, they cannot use particularized plans or processes disclosed to them by their previous employer which are unknown to others in the industry and which give the owner of such information an

advantage over its competitors. *PepsiCo I*, 54 F.3d at 1269; *AMP, Inc. v. Fleischhacker*, 823 F.2d 1199, 1202 (7th Cir. 1987).

In light of the above factors, the Court concludes that Huawei has a strong likelihood of succeeding on its threatened misappropriations of trade secrets claim against Motorola and NSN.

### B. Irreparable Harm

A party is irreparably harmed where the damages the party suffers are difficult to calculate or where the remedy comes too late to save the plaintiff's business. *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994). Where trade secrets are involved, the threat is significant that the harm experienced by a misappropriation will be irreparable. *IDS Fin'l Servs. v. Smithson*, 843 F. Supp. 415, 418 (N.D. Ill. 1994). Since competitive position in an industry defies calculation, courts lack a reasonably precise method of calculating the pecuniary damage a corporation faces for its loss of competitive position sustained by the disclosure of its trade secrets and confidential information. *PepsiCo II*, 1996 WL 3965, at *30.

The Court concludes that Huawei is likely to suffer irreparable harm if, without Huawei's consent and prior to arbitration, Motorola provides NSN with Huawei confidential information or if former Motorola employees use Huawei confidential information after transfering to NSN. In either case, NSN would gain an unfair competitive advantage at Huawei's expense.

### C. Balance of Hardships

There is a risk that NSN will walk away from the Motorola/NSN transaction if the Court enters an order that prevents Motorola from using its best efforts to effectuate the assignment of the Motorola-Huawei agreements. Neither Motorola nor NSN has presented any evidence that the injunctive relief proposed by Huawei will provide NSN with a basis to walk away from the

pending transaction.  Furthermore, the Motorola/NSN transaction may not close for other reasons including a lack of approval by MOFCOM.  The evidence establishes that Motorola may suffer harm if the transaction does not close by April 30, 2011 but this same evidence fails to establish a causal connection between the transaction's success or failure and an injunction protecting Huawei's confidential information.  The harms Motorola alleges it will suffer are attributable to causes other than the instant lawsuit.  The increased attrition rate and the loss of market share that Motorola has experienced predate the filing of this action and stem from the uncertainty caused by the delay in closing the Motorola/NSN transaction.  Neither Motorola nor NSN argue that Huawei is in any way responsible for this delay.

The Court finds that the balance of hardships weighs in Huawei's favor as the harm that it will suffer if Motorola and NSN are not enjoined is concrete and the causes are identifiable whereas the risk that the pending transaction will not close is speculative and the causes for such cannot yet be known.

### D.  Public Interest

The public interest is well-served by enforcing valid agreements and protecting trade secrets.  Trade secrets law serves to protect "standards of commercial morality" and encourage invention and innovation while maintaining the public interest in having free and open competition in the manufacture and sale of unpatented goods.  *PepsiCo I*, 54 F.3d at 1268.  The Court finds that the public interest favors granting an injunction to ensure that Huawei's trade secrets are protected and that its bargained-for right to meaningful arbitration is maintained.

**ORDER**

Huawei has demonstrated that it has a reasonable likelihood of success on the merits of its threatened misappropriation of trade secrets claim against Motorola and NSN relating to NSN's plan to acquire Motorola's networks business and hire former Motorola employees with knowledge of Huawei's trade secrets. Huawei has established that it will suffer irreparable competitive harm if its trade secrets are disclosed to NSN or are inevitably relied upon by former Motorola employees who transfer to NSN. The balance of hardships lies in its favor, and the public interest will be furthered by affording meaningful protection to Huawei's confidential information.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY**

**ORDERED THAT** effective immediately:

1.      For purposes of this Order, "Huawei Confidential Information" includes information or documents provided to Motorola by Huawei that have not been publicly disclosed by Huawei and that constitute or relate to:

- Huawei's ABIS interface design specifications, other design specifications, proprietary software and code for Huawei's wireless and core network techncologies and products, and any work derived thereof;

- Huawei Offering Requirements ("OR"), Design Requirements ("DR"), Scenario Designs ("SD"), Service Scenario Analyses ("SSA"), "AR," and similar Huawei technical documents that contain detailed information about the design, features, functionality and operation of Huawei products;

- Configuration Manuals, Configuration Specifications, Configuration Tools and other confidential configuration and pricing information and tools for Huawei products and system configurations;

- Huawei's future market strategy and future products to the extent that Huawei has not made that information public (for example, product roadmaps that address

future product plans);

- Performance, operation, interoperability and standards compliance of Huawei's products (for example, testing reports and analyses, test cases, statements of compliance, feature lists and analyses, training information and materials);

- Vendor service support and the resources, tools and systems used to provide those services (for example, pre-caution notices, problem reports and solutions made available to Motorola on Huawei's iCare system and Global Customer Request Management System, maintenance service documentation, tools and resources); and

- Confidential information or trade secrets as defined by the Huawei-Motorola Agreements.

2.      Huawei Confidential Information for purposes of this Order as it pertains to NSN shall not include information that NSN receives pursuant to a managed services agreement with a Huawei customer, provided that use of such information comports with the applicable agreements, including any non-disclosure agreement and any use restrictions relating to such information.

3.      Defendant Motorola and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are hereby enjoined from:

- Disclosing Huawei Confidential Information to NSN, directly or indirectly, by any means;

- Inducing, encouraging, or providing material aid to others to disclose or use Huawei's Confidential Information;

- Granting NSN personnel access to Huawei Confidential Information or trade secrets; and

-22-

- Transferring any records or assets to NSN, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts, that contain, reference or disclose any Huawei Confidential Information.

4.      Defendant NSN and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are hereby enjoined from:

- Using Huawei Confidential Information disclosed to it by Motorola either directly or indirectly, for any purpose;

- Inducing, encouraging, or providing material aid to Motorola and its subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them to disclose Huawei's Confidential Information to NSN;

- Granting NSN personnel access to Huawei Confidential Information or trade secrets that Huawei has made available to Motorola; and

- Acquiring any records or assets of Motorola, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts, that contain, reference or disclose any Huawei Confidential Information.

5.      Defendants Motorola, NSN and their subsidiaries, affiliates, officers, directors, agents, employees, servants, licensors, successors, assigns, and all those acting in concert with them, are further ordered to comply with the following requirements to ensure that Motorola does not transfer and NSN does not acquire or use any Huawei Confidential Information.

- Motorola and NSN shall take all necessary steps to ensure that Motorola does not transfer and NSN does not acquire any Huawei Confidential Information as part of NSN's acquisition of any records or assets of Motorola, including but not limited to hard copy records, servers, databases, web-based or internet resources, mobile phones or other handheld devices used for business purposes, personal computers, hard drives, computer hardware, computer memory, electronic or digital media, software, code of any type, and any equipment, prototypes, samples or parts.

- Before any Motorola records or assets that could contain Huawei Confidential Information are transferred from Motorola to NSN, Motorola and NSN shall retain a qualified third party vendor to inspect those records and assets to ensure that all Huawei Confidential Information has been removed and can no longer be recovered by any means.

- NSN shall maintain auditable records of all service it performs on Motorola-branded systems that include Huawei products. The records shall include the name of the customer, the location of the system or equipment being serviced, the problem reported, the resolution of the problem, the resources used to resolve the problem, and the name(s) of the NSN personnel who perform the servicing.

- NSN shall assign an employee in the United States who is familiar with this Order to be responsible for performing periodic audits on the service call records. Huawei shall have a right to audit the NSN service records on a monthly basis during the time period that this injunction is in effect, but only with regard to records that relate to servicing of Huawei hardware and software products. In the event that it is not possible to segregate records relating to Huawei products, a qualified third party shall be retained to review the records, segregate records relating to Huawei products and provide Huawei with access to those segregated records.

- All Motorola employees who have had access to Huawei Confidential Information and who accept employment at NSN will be provided with notice of this Order and will be specifically informed, and will sign an undertaking, that (1) they cannot retain any Huawei Confidential Information when they move to NSN; (2) they cannot disclose any Huawei Confidential to any other employee or representative of NSN; and (3) they cannot use Huawei Confidential Information for any purpose once they have commenced employment at NSN

6.      With respect to Motorola, this injunction is to remain in effect until Huawei

returns to this Court with enforceable interim relief from the arbitral tribunal or the arbitral

tribunal denies Huawei's request for interim relief or until further order of this Court;

7.      With respect to NSN, this injunction is to remain in effect until further order of

the Court.

8.      Huawei is ordered to post a security bond in the amount of $500,000 with the

Clerk of the Court to pay the administrative costs and third party vendor fees associated with the

auditing and monitoring system included in this injunction should it be determined that Motorola

and NSN were wrongfully enjoined.

9.      This Court's Temporary Restraining Order of January 24, 2011 as modified on

January 27, 2011 and February 10, 2011 is hereby vacated.

**IT IS SO ORDERED.**

Date:    February 22, 2011             By: _____

                                       The Honorable Sharon Johnson Coleman
                                       United States District Court Judge